IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CARLOS T. CAMPAZ, JR.,

Petitioner, No. CIV S-10-2967 JAM CHS

vs.

JAMES A. YATES,

Respondent.

FINDINGS AND RECOMMENDATIONS

_______________________________/

I. INTRODUCTION

Carlos Campaz, a state prisoner, proceeds pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Campaz stands convicted of first degree murder in the Sacramento County Superior Court, case number 045F07255, for which he is serving a life sentence in state prison.

II. FACTUAL AND PROCEDURAL BACKGROUND

The California Court of Appeal, Third District, summarized the evidence adduced at the joint trial of Campaz and his co-defendants, John Douglas White and Robert Moreno Montoya, for the murder of Jerimi Millican, as follows:

/////

On August 5, 2004, around 8:00 a.m., park maintenance workers discovered the victim's body in a restroom at Gardenland Park near Northgate Boulevard in Sacramento. The cause of death was multiple stab wounds; the time of death was estimated at 5:00 a.m.

Marie Ceragioli, who was friendly with Campaz and performed home improvement work at White's house, testified that a few days after the killing, she was at a restaurant with Campaz when he admitted his participation. Campaz said, "Doug [White] got me twenty-five to life. I think I'm in some serious trouble, and I'm like what's going on."

Ceragioli testified at trial that Campaz told her the following: White planned to beat the victim "badly" for raping White's sister when White had been too young to do anything about it, and Campaz went to "back him up" to stop anyone from interfering. Campaz and White waited at the park. Montoya brought the victim there on the pretext of a drug buy. They went into the park bathroom, where White started screaming and "just going crazy," "whaling on [the victim] ... in a rage" with two knives, one of which had spikes. Campaz was in shock; he did not expect this and had no idea White had a knife. The victim tried to run out of the bathroom, but Campaz panicked and pushed the victim back in. (Although there was some evidence that Campaz, in recounting the incident to Ceragioli, displayed a stabbing gesture rather than a pushing gesture, the jury found Campaz did not personally use a knife.) The victim fell, and White continued the attack. Campaz told White to stop because the victim was dying. In later conversations with Ceragioli, Campaz changed details, e.g., he said Montoya also stabbed the victim and the planned beating was over drug debts rather than rape. At some point, Campaz and White told Ceragioli they took money and drugs from the victim to make it look like a drug transaction. White threw the weapons in the river. They tried but failed to burn their escape vehicle-a stolen truck in White's possession. (The police found White's blood and the victim's blood in the truck.)

Ceragioli called the crime "tip line," believing she could stay anonymous, but a police detective contacted her. She told the detective on August 20, 2004, that Campaz said the plan was to murder the victim. At the preliminary hearing, Ceragioli said Campaz thought the plan was to beat the victim, not murder him. At trial, Ceragioli said Campaz said the plan was to beat the victim badly enough to hospitalize him.

At trial, Ceragioli was asked about her preliminary hearing testimony, where she said the plan according to Campaz was to "beat" the victim, but she did not say "badly." She testified at trial that the amount of information was overwhelming, and "you guys were very vague at prelim." She said Campaz said the plan was to beat the victim "badly" and "put him in the hospital."

At trial, Ceragioli acknowledged she used methamphetamine during some of the conversations with Campaz and White. She was asked about her preliminary hearing testimony, where at one point she invoked the Fifth Amendment to a question about her own drug use but at another point answered “no” to a question, “have you in fact used methamphetamine yourself.” At trial, she said she interpreted this latter question as referring to the specific time of the murder.

Ceragioli did construction work at White’s house even after learning of the killing. White said he stepped over the victim to “take a piss,” and White bragged about getting an uninvolved acquaintance, Anthony Martinez, to confess on audiotape. Ceragioli testified she felt it was her duty to keep returning to the home of someone she believed to be a killer, because she used to work in the victim witness program in the San Diego District Attorney’s office.

Campaz always carried a distinctive Protech pocket knife given to him by Ceragioli. After the killing, he gave it to her, and she turned it over to the police. It had a small pinkish stain, which did not test positive as blood but was more likely rust.

Campaz eventually agreed to turn himself in to the police, and Ceragioli made the call.

In cross-examination of Ceragioli, the Campaz defense elicited that Ceragioli was angry with her ex-lover, Geri Quintana, for supporting Campaz, and left threatening phone messages. Ceragioli received a $500 reward from the police but also had to relocate due to threats she received warning her not to testify against White. Ceragioli admitted prior hospitalizations for mental health problems.

Martinez testified he and others consumed drugs at White’s house the night of the killing. Martinez saw the victim leave the house with Montoya; Campaz and White left with them or a few minutes later. Martinez was awakened when the three later returned without the victim. Campaz appeared nervous and scared. White left briefly, and Campaz and Montoya argued over who killed the victim. White returned and said he killed the victim for raping White’s sister, and he was going to kill Martinez so he could not snitch. White told Campaz to stab Martinez, but Campaz said no, Martinez was like a brother to him. White held a machete to Martinez’s throat and forced him to say, “I killed Jerimi” into a tape recorder.

Michael Gardner testified he was sleeping at White’s house the night in question, was awakened and saw White, Campaz and Montoya on the roof, and later overheard a conversation between Campaz and Montoya, in which Gardner believes he heard

Montoya say something to the effect "did we hurt him?" or "did we kill him?" After a couple of seconds or minutes, Campaz said something like "keep quiet" or "don't tell [White]."

Timothy Chacon testified White phoned him around 6:00 a.m. on August 5, 2004, needing a ride. White was upset and crying. He said, "I" and "we" "fucked up." Chacon drove to the levee. White got out of the car. Chacon saw a splash in the water. Days later, White was on drugs and said he killed someone who owed money for methamphetamine, but Chacon did not believe him.

In the first trial (wherein Campaz and Montoya were convicted but White's jury deadlocked), White testified in his own defense, in front of all three juries. White denied any animosity toward the victim at the time of the killing. White was previously upset with the victim for failing to return a truck and money borrowed from White. The victim later returned the truck and money, and everything was fine between them. White's sister was raped years earlier, but not by the victim, and White denied accusing the victim of rape.

On August 4, 2004, White spent much of the day consuming marijuana and methamphetamine with Campaz, who arrived already "wired." They continued the party that night with Montoya, the victim, and others. They consumed alcohol and smoked marijuana and methamphetamine. The victim and Montoya borrowed from White a blue pickup truck (stolen by someone else) and went to the park to buy drugs from Montoya's cousin. Later, White and Campaz went to the park in a friend's red pickup truck. They found Montoya and the victim sitting on a bench. White went into the park bathroom to urinate and then joined the others outside. Because it was windy, Montoya, Campaz, and the victim went into the bathroom to smoke some methamphetamine. White stayed outside and smoked marijuana. Campaz came out, saying, "Let's get the fuck out of here." Montoya then came out with a blank look on his face. White looked into the bathroom and saw the victim face down on the ground.

White, Campaz, and Montoya drove in White's truck to the red pickup, but they saw a police car and kept going. Campaz said, "Man we fucked up. We fucked up." They drove to White's house, but the other party people were still there, sleeping, so White had Campaz and Montoya get up on the roof and remove their bloody clothes. White testified he was afraid of Campaz from having been threatened by him several weeks earlier, when White saw Campaz stab a friend, Fernando Perez, for allegedly stealing a Play Station.

By now, it was daylight. White called a friend, Tim Chacon, for help. Chacon drove White to the river, where White threw two knives, a wallet, a key ring and a cell phone off a bridge. White

> wrapped the bloody clothes in a blanket and set fire to it. White testified he told Chacon, "I fucked up" but did not say he hurt anyone.
>
> The next day, White briefly "whal[ed] on" Anthony Martinez over a suspected theft. White said it was Campaz who ordered Martinez to say into a tape recorder operated by White, "I, Anthony Martinez, killed Jerimi Millican at Gardenland Park." White said Ceragioli told him he better not snitch on Campaz. White testified he was afraid of Campaz because White thought Campaz was a member of the Norteño street gang. White admitted to being a Norteño associate while in jail during the trial.
>
> White admitted he lied in his statement to the police.
>
> Tomas Wayne testified he loaned his red pickup truck to his friend, Campaz. Several days after the killing, Wayne discovered his truck near the park and called the Crime Alert tip line. Wayne reported that Montoya said he was being blamed for the killing but all he did was drop the victim off at the park. Wayne previously saw White showing off a knife with spikes.
>
> Campaz did not testify but put on a defense case that included testimony of Dr. John Wicks, an expert in clinical psychology, in an attempt to impeach Ceragioli. Dr. Wicks reviewed Ceragioli's mental health records, which revealed a diagnosis of borderline personality disorder with features consistent with methamphetamine abuse.
>
> Dr. Wicks testified that persons with severe personality disorders tend to have amorphous memories and distort information, particularly when stressed. Threatening phone messages left by Ceragioli are consistent with an ongoing personality disorder. Methamphetamine abuse can also cause brain damage affecting memory function, exacerbating the problems related to the personality disorder.

*People v. Campaz*, No. L 1680543, 2010 WL 1680543, at 1-4 (Cal. App. 3 Dist. 2010).

Campaz, White, and Montoya were tried jointly to three separate juries. Campaz's jury found him guilty of first degree murder but found "Not True" the two allegations of (1) lying in wait and (2) personally using a deadly and dangerous weapon (a knife). The court sentenced him to an indeterminate term of twenty-five years to life. On appeal, the California Court of Appeal, Third district, affirmed the conviction and the California Supreme Court denied

a petition for review.[1]

## III. GROUNDS FOR RELIEF

Campaz's federal petition sets forth four related grounds for relief, designated one through four. His traverse clarifies that he additionally intends to assert a fifth ground for relief and the petition will be liberally construed to include the fifth ground although it was not explicitly designated.[2] *See Roy v. Lampert*, 465 F.3d 964, 970 (pro se habeas filings must be liberally construed); *Belgarde v. State of Montana*, 123 F.3d 1210, 1213 (9th Cir. 1997) ("We construe a pro se litigant's habeas petition with deference."). Campaz asserts, verbatim:

A. There is no "misdemeanor murder" rule in California;

B. Numerous instructional errors concerning the natural and probable causes doctrine require reversal;

C. Under the natural and probable consequences doctrine and the facts of the case, [he] may not be convicted of more than second degree murder;

D. The "Ireland" rule should bar predicating murder liability on aiding and abetting assaultive crimes under the natural and probable consequences doctrine;

and

E. The court[']s instruction on voluntary intoxication was prejudicially inadequate, denying [Campaz] due process of law and his right to a jury determination of all issues.

For the reasons that follow, all grounds asserted are without merit and it is recommended that the petition be denied.

/////

---

[1] Montoya's jury found him guilty of second degree murder, with personal use of a knife. White's jury deadlocked, and the court declared a mistrial. At White's retrial, Montoya testified as a prosecution witness and the jury found White not guilty of first degree murder but guilty of second degree murder with a finding that he did not personally use a knife.

[2] While arguments raised for the first time in a traverse are not properly considered, Campaz's fifth ground was included in the federal petition and is properly before the court. Although the fifth ground was not designated "ground 5," it was set forth in the body of the petition by virtue of his attachment of his state habeas corpus petition.

IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under the AEDPA, federal habeas corpus relief is also precluded for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision to determine whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919. The state court's factual findings are presumed correct if not rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004). It is the habeas corpus petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

/////

/////

## V. DISCUSSION

### A. "Misdemeanor Murder"

Campaz asserts that guilt for murder cannot be predicated on aiding/abetting a simple misdemeanor assault because to do so would be an impermissible back-door expansion of the felony murder rule to a so-called "misdemeanor murder" rule. The California Court of Appeal rejected this claim in light of a California Supreme Court opinion filed while Campaz's appeal was pending. The court of appeal explained:

> *Medina* said, "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonable foreseeable consequence of the act aided and abetted.' [Citation.]" (*Id.* 46 Cal.4th at p. 920.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]"....
>
> ....
>
> Thus, under *Medina, supra,* 46 Cal.4th 914, the critical point is not whether an assault could be characterized as a simple assault, but whether a rational trier of fact could conclude on the particular facts of the case that murder was a reasonably foreseeable consequence of the assault.

*People v. Campaz*, *supra*, at 11.

Thus, California law permits a murder conviction based on a theory that it is a natural and probable consequence of simple assault. This court is bound by the state court's interpretation of its own law in this regard. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (*per curiam*) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Moreover, a claim that the state court erred in applying its own law regarding whether attempted murder is a natural and probable consequence of simple assault is not cognizable here. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

B.      Instructional Errors on Natural and Probable Consequences

        1.   Instruction on Simple Assault

Campaz's jury was instructed on simple assault and various instructions referenced simple assault as a target crime that would support murder liability under an aiding/abetting and natural and probable consequences theory of guilt. Campaz asserts, and the California Court of Appeal agreed, that there was insufficient trial evidence to warrant the instructions on simple assault. Nevertheless, the state court held that any error was harmless.

A claim of instructional error does not raise a cognizable federal claim unless the error, considered in context of all the instructions and the trial record as a whole, "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 71-72; *Henderson v. Kibbe,* 431 U.S. 145, 152-55, n.10 (1977); *Cupp v. Nauhten,* 414 U.S. 141, 146-47 (1973). In addition, on federal habeas corpus review, no relief can be granted without a showing that the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Thus, in order to grant habeas corpus relief where a state court has determined that a constitutional error was harmless, a reviewing court must determine: (1) that the state court's decision was contrary to or an unreasonable application of Supreme Court harmless error precedent, *and* (2) that the petitioner suffered prejudice under *Brecht* from the constitutional error. *Inthavong v. LaMarque*, 420 F.3d 1055, 1059 (9th Cir. 2005).

Even assuming, as the state appellate court held on Campaz's direct appeal, that instructions on simple assault were unwarranted under state law, the giving of those instructions did not so infect his trial that his resulting conviction violates due process. From the evidence adduced at trial, no juror would have chosen simple assault as the target offense to find Campaz guilty of first degree murder under the natural and probable consequences doctrine.

The prosecutor presented three theories for finding Campaz guilty of first degree murder: "Willful and deliberate premeditated murder, lying in wait or conspiracy, or aiding and

abetting the commission of first degree murder." (RT at 5442.) If a juror rejected the first two and focused on aiding and abetting the commission of first degree murder, the juror would then examine the three target offenses set forth: assault, assault with force likely to produce great bodily injury, and assault with a deadly weapon. (RT at 5180-81, 1209.) But no juror would have found that Campaz only intended for the victim to suffer a simple assault, which was defined for the jury as "an act that by its nature would directly and probably result in the application of force to a person" (Clerk's Transcript ("CT") at 1214). The evidence was that the plan was to lure the victim to the park to either beat him up badly or to murder him. (RT at 2476, 2542, 2558 [beat up]; 1678-79, 1682 [murder]). Beating the victim up badly or murdering him would necessarily involve either "force used [that] was likely to produce great bodily injury" (CT at 1215) or use of a "deadly weapon" (CT at 1216).

Based on the foregoing, the state appellate court's finding of no prejudice was reasonable and any instructional error did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637.

2. "Equally Guilty" Language

Campaz's jury was instructed that a person may be guilty of directly committing a crime (as the perpetrator) or aiding/abetting the crime, and "[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. The jury was further instructed that if the evidence established aiding and abetting one crime, the aider/abettor may also be found guilty of other crimes that occurred during the commission of the first crime. (CT at 1193.) In response to jury questions, the trial court told the jurors that defendant was "equally guilty" of murder if the jury found he aided/abetted assault, and murder was a natural and probable consequence of the assault. (CT at 1273.) The trial court declined a defense request to add to that response that "the level of crime you determine it to have been proven the perpetrator committed does not necessarily dictate the level of crime an aider/abettor committed." *People v. Campaz*, *supra*, slip op. at 7.

Campaz argues the trial court's instructions were misleading to the extent they indicated that an aider/abettor is "equally guilty" with the perpetrator on a natural and probable consequence theory. The California Court of Appeal agreed to some extent, but rejected the claim that any error warranted reversal, holding:

> When the jurors asked if they had to find defendant, as an aider/abettor, guilty of first degree murder upon finding one of the defendants committed a first degree murder, it would have been clearer had the court given a direct answer of "No." However, the court's reiteration of the law (that defendant was guilty of murder if murder was a natural and probable consequence of the aided/abetted assault) was not incorrect. The court said the defendant in such a case would be equally guilty of murder, but the court did not say equally guilty of *first degree* murder. To the extent the court's first response may be viewed as inadequate, it was corrected in the court's subsequent response, that if the jurors found defendant intended to aid/abet an assault (with great bodily injury, etc.), and if they found a perpetrator committed an unlawful killing, "you must then determine whether or not the crimes of first degree murder, second degree murder, voluntary manslaughter or involuntary manslaughter were a natural and probable consequence of the assault [etc.]" Thus, the court properly instructed the jury to determine Campaz's liability based on what degree of homicide offense was the natural and probable consequence of the assault, not based merely on what degree of homicide offense was committed by the perpetrator.
>
> Campaz argues that, if he aided/abetted assault with a deadly weapon and/or by force likely to cause great bodily injury, then the jury could find either manslaughter or murder as a reasonably probable consequence, but the instructions did not explain those alternatives "in a meaningful way." We disagree that the instructions were inadequate.
>
> Campaz argues the jury's findings that he did not use a knife and did not lie in wait demonstrate that the jury found Campaz did not go to the park with the intent to commit an assault with a deadly weapon or an intent to kill with deliberation and premeditation. However, Campaz did not need to use a weapon or lie in wait in order to be convicted of first degree murder as a natural and probable consequence of aiding/abetting assault with force likely to cause great bodily injury under the circumstances of this case.
>
> We conclude there was no reversible error regarding aiding and abetting.

*People v. Campaz*, *supra*, at 19-20.

There is no indication that the jury applied the challenged instruction in an unconstitutional manner. For the reasons discussed by the state appellate court, Campaz fails to demonstrate the jury instructions, taken as a whole and in context of each other, so infected his trial with unfairness that his conviction violates due process. *See Estelle*, 502 U.S. at 71-72.

C. Conviction of Offense Greater than Second Degree Murder

Campaz argues that he, as an aider/abettor, was improperly convicted of a crime greater than that committed by the actual perpetrator whom he aided/abetted. As set forth, upon retrial, co-defendant White was convicted of second degree murder while Campaz was convicted in his trial of first degree murder. As the state court held, however, under *Standefer v. United States*, 447 U.S. 10 (1980), Campaz cannot rely on a verdict in a different trial by a different jury presented with different evidence to show that his jury found him guilty of a greater offense than the perpetrator. The state court's decision in this regard was consistent with, and a reasonable application of clearly established Supreme Court precedent.

D. The Rule of *People v. Ireland*

Campaz argues that a murder conviction based on aiding and abetting an assault violates the rule of *People v. Ireland*, 70 Cal.2d 522 (1969). In *Ireland*, the California Supreme Court held that felony assault merges with homicide and thus cannot form the basis for felony murder. The California Court of Appeal rejected Campaz's claim of state law error:

> In *People v. Karapetyan* (2006) 140 Cal.App.4th 1172 (*Karapetyan* ), this court held the natural and probable consequences doctrine does not improperly merge all assaults into the felony murder rule. There, a defendant argued that a finding of murder based on aiding/abetting an assault was really just felony murder, barred by *Ireland's* merger rule (*Ireland, supra,* 70 Cal.2d 522). (*Karapetyan, supra,* 140 Cal.App.4th at p. 1177.) This court disagreed. The opinion said the argument would be viable if the law stated that anyone who aided/abetted an assault that ended in death would be guilty of murder, whether or not the death was a natural and probable consequence of the assault. (*Id.* at p. 1178.) That would be a merged felony murder based on assault and would be prohibited by *Ireland.* However, the opinion said, "the natural and probable consequences doctrine operates independently of the second degree felony-murder rule. (*People v. Culuko* (2000) 78

> Cal.App.4th 307, 322.) The natural and probable consequences doctrine does not merge all assaults into the felony-murder rule. Rather, it is a theory of liability for murder that applies when the assault has the foreseeable result of death. For aider and abettor liability, it is the intention to further the acts of another that creates criminal liability and not the felony-murder rule. [Citation.]
>
> "'An aider and abettor's derivative liability for a principal's criminal act has two distinct prongs: First, the aider and abettor is liable for the particular crime that to his knowledge his confederates are contemplating. Second, the aider and abettor is also liable for the natural and probable consequences of any criminal act he knowingly and intentionally aids and abets.... [¶] ... The law's policy is simply to extend criminal liability to one who knowingly and intentionally encourages, assists, or influences a criminal act of another, if the latter's crime is naturally and probably caused by (i.e., is the natural and probable consequence of) the criminal act so encouraged, assisted, or influenced.' [Citation.] Accordingly, the logical and legal impediments to felony-murder liability discussed in *Ireland* are inapplicable and do not limit the liability of an aider and abettor. [Citation.]" (*Karapetyan, supra,* 140 Cal.App.4th at p. 1178.)
>
> *People v. Culuko* (2000) 78 Cal.App.4th 307 (*Culuko*), said: "The natural and probable consequences doctrine operates independently of the second degree felony-murder rule. It allows an aider and abettor to be convicted of murder, without malice, even where the target offense is not an inherently dangerous felony. (See., e.g., *People v. Lucas* (1997) 55 Cal.App.4th 721, 732-733 [target offense of brandishing a firearm]; *People v. Laster* (1997) 52 Cal.App.4th 1450, 1463-1466 [target offense of discharging a firearm from a motor vehicle].)" (*Culuko, supra,* 78 Cal.App.4th at p. 322.) "The Supreme Court has repeatedly rejected the contention that an instruction on the natural and probable consequences doctrine is erroneous because it permits an aider and abettor to be found guilty of murder without malice. [Citations.]" (*Culuko, supra,* 78 Cal.App.4th at p. 322.)
>
> Accordingly, we reject Campaz's argument about merger.

*People v. Ireland*, *supra*, at 9-10.

Thus, the California Court of Appeal concluded that, as a matter of state law, the felony-murder "merger" rule set forth in *Ireland* did not apply in Campaz's case. This court cannot substitute its interpretation of *Ireland* for that of the state court. *See Estelle*, 502 U.S. 62, 68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Campaz's argument premised on violation of state law fails to allege a

cognizable ground for relief.

D. Voluntary Intoxication Instruction

Campaz's jury was instructed regarding voluntary intoxication, in part, as follows:

> If you find that the defendant was intoxicated at the time of the alleged crime, you may consider that evidence in a limited way. You may consider that evidence only in deciding the following:
>
> * Whether the defendant acted with the intent required for murder, voluntary manslaughter, lying in wait, aiding and abetting and/or conspiracy.
>
> * Whether the defendant acted with the state of mind required for murder, voluntary manslaughter, lying in wait, aiding and abetting, conspiracy or the natural and probable consequence doctrine.
>
> The previous instructions I have given you for these offenses define the intent and/or state of mind required.
>
> You may not consider evidence of voluntary intoxication for any other purpose.

(CT at 1220.)

Campaz's complaint about the voluntary intoxication instruction is twofold: first he argues the instruction was "prejudicially inadequate," denying him due process of law and the right to a jury determination of all issues, because the instruction said that jurors "may" rather than "must" consider the evidence regarding intoxication. The California Court of Appeal rejected this argument: "The contention fails. We consider the instructions as a whole [citation], and other instructions told the jurors they "must impartially compare and consider all the evidence[.]" *People v. Campaz*, *supra*, at 20.

Campaz further complains that, although the jury was instructed that voluntary intoxication was relevant to intent or state of mind, the instructions on aiding/abetting and natural and probable consequences referenced the instruction defining assault, which told the jury that "voluntary intoxication is not a defense to assault." As to this point, the California

Court of Appeal held:

> Campaz thinks this latter sentence should not have been included in the instructions to his jury and must have confused the jury. However, assuming for the sake of argument that the contention is preserved for appeal, any error was harmless beyond a reasonable doubt because, as the prosecutor observed in closing argument, there was evidence of drug use but no evidence that the drug use had any impact on Campaz's mental faculties.

*People v. Campaz*, *supra*, at 21.

Once again, Campaz fails to demonstrate that the jury instructions, taken as a whole and each in context of the others, violated his right to due process of law. First, there is no indication that the jury applied any of the instructions in an unconstitutional manner. Moreover, it is presumed that the jury understood and followed the instructions given. *See generally Greer v. Miller*, 483 U.S. 756, 766 (1987). Campaz's assertion that the jury was potentially confused is speculative and will not suffice for habeas corpus relief. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (conclusory allegations lacking in factual support do not provide a sufficient basis for habeas corpus relief). Campaz is not entitled to relief for any of his claims.

## VI. CONCLUSION

For the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus be denied; and

2. A certificate of appealability not issue.

These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time waives the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). Any reply to the objections shall be filed and served within seven days after service of the objections.

DATED: March 30, 2012

Charlene H Sorrentino
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE